J.D. Jordan
Box 23866
New Orleans
Louisiana 701283
504-737-3854

**FILED**

OCT 28 2016

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

J.D. JORDAN, Pro Se
      Plaintiff,

v.

JAY C. HOAG, TCV VII L.P., TCV VII (A),
L.P., TCV MEMBER FUND, L.P., and
NETFLIX, INC.

     Defendants.

Civil Case No.: 5:15-CV-18 19-EJD

Reply to Motion to Dismiss

---

### Reply to Jay Hoag and TCV's 12 b-6 Motion to Dismiss.

1. FRCP 12 b-6 is about

"(6) failure to state a claim upon which relief can be granted."

In order to prevail in their 12 b-6 Motion, Defendants must illustrate that the

Plaintiff has "failed to state a claim upon which relief can be granted".

2. The U.S. Supreme Court stated what is required for a successful 12 b-6

motion in the following words:

"The general rule in appraising the sufficiency of a complaint for failure to state

a claim is that a complaint should not be dismissed `***unless it appears beyond

doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief. CONLEY VS. GIBSON (1957), 355 U.S. 41, 45, 46.

1

3. So this Suit under 16 b that was filed by the Plaintiff should not be dismissed: "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief".

4. This 16 b suit illustrates all of the required elements of a successful outcome. Those elements are the following.

A. Plaintiff must be a shareholder when the suit was filed... This element is satisfied.

B. There must be non exempt sale(s) of equity securities matched with a non exempt purchase(s) of equity securities within 6 months. This is satisfied as will be clearly illustrated later in this Reply.

C. There must be profits made from the non exempt purchase (s) and the non exempt matched sale(s). There is no question that approximately $85,000,000 profits were made from the matched sales and purchases.

D. The defendants must be insiders (i.e. an officer, or a director or a greater than 10% beneficial owner of 10% of the outstanding stock) when each of the non exempt matched transactions are made. There is no question that Hoag was a long term director and that he was an insider at all times. Plaintiff believes that the TCV Funds were insiders at all relevant times as Plaintiff has asserted.

E. The TCV Funds are in all probability deputized directors given the connection to Hoag and the beneficial ownership and pecuniary ownership of the

**2**

$200,000,000 note and their later ownership of the 2,331,000 shares of the underlying shares. However, whether they are deputized directors is a factual question which the Ninth Circuit in Dreiling v. American Express 458 F.3d 942 (9th Cir. 2006) declared is a factual question and not to be decided on a 12 b-6 Motion to dismiss. Below is a quote from the Ninth Circuit adopting the SEC's Amicus Curiae's Brief,

*Whether the TRS executive was a director by deputization and whether the InfoSpace board was knowledgeable as to that relationship are questions of fact that defeat dismissal under Federal Rule of Civil Procedure 12(b)(6). We thus reverse and remand for further proceedings.*

5. Thus in summary, all of the elements of a violation of 16 b of the 1934 Securities Act have been presented and the Motion to Dismiss by defendants has no merit. However: The defendants claim that the only possible matching non exempt purchase was the purchase of the the convertible note on Nov 28, 2011. They affirm this in their Motion to Dismiss since the purchase was a non exempt purchase matched with the non exempt stock sale of 4510 shares on July 28, 2011, which resulted in a recovery of profits under 16 b by Netflix from TCV/Hoag.

## Analysis of the Convertible Note.

6. The $200,000,000 Convertible note consisted of three parts:
A). A loan from TCV/Hoag to Netflix with no interest payable with a duration of 7 years.
B) An embedded call giving TCV/ Hoag the right to convert their ownership of the note to ownership of 2,331,060 shares.
C) An Option to Convert that Netflix owned, whereby TCV/Hoag would become

**3**

owners of the shares instead of the note upon exercise of Netflix Option to Convert.

7. The Indenture of the Note describes the Options to Convert held by each party as below underlined:

**Section 10.01. Right to Convert.**

(a)   Subject to and upon compliance with the provisions of this Indenture, at any time prior to the close of business on the Business Day immediately preceding Maturity Date, the Holder of any Securities not previously redeemed or repurchased shall have the right, at such Holder's option, to convert the principal amount of the Securities held by such Holder, or any portion of such principal amount which is an integral multiple of $1,000, into fully paid and non-assessable shares of Common Stock (as such shares shall then be constituted) as described in Section 10.13, at the Conversion Rate in effect at such time, by surrender of the Securities to be converted in whole or in part, together with any required funds, and in the manner provided in Section 10.02.

(b) Securities in respect of which a Holder has delivered a Change of Control Repurchase Notice exercising such Holder's right to require the Company to repurchase such Securities pursuant to Section 3.01, may be converted only if such Change of Control Repurchase Notice is withdrawn in accordance with Section 3.03 prior to 5:00 p.m., New York City time, on the Business Day immediately preceding the Change of Control Repurchase Date.

(c) A Holder of Securities is not entitled to any rights of a Holder of Common Stock until such holder has converted his Securities to Common Stock, and only to the extent such Securities are deemed to have been converted to Common Stock under this Article 10.

**Section 10.05 . Conversion at the Option of the Company .**

(a) The Company may elect to mandatorily convert the Securities (a " **Mandatory Conversion** ") at any time after May 28, 2012 if (x) the VWAP Price of the Common Stock is greater than or equal to 130% of the applicable Conversion Price for at least 50 Trading Days (including the Trading Day immediately prior to the date of the Company Conversion Notice (the " **Mandatory Conversion Date** ")) during any 65 Trading Day period prior to the date of the Company Conversion Notice (as defined below) (the **"Trading Price Condition** ") and (y) in the case of any Securities held by TCV Entities,

4

the TCV Conversion Conditions have been satisfied.

The Company will make appropriate adjustments determined by the Company or its agents to account for any adjustment to the Conversion Rate that becomes effective, or any event requiring an adjustment to the Conversion Rate occurs, at any time during the period from which the VWAP Price is to be calculated.

8. The attorneys for TCV/Hoag are attempting to combine the two Conversion Options into one derivative in their analysis which according the 2nd Circuit in Magma Power v. Dow Chemical  136 F.3d 316(2d Cir 1998) is Problematic. the Second Circuit said in that case that :

**"The better approach is to treat as analytically distinct each option contained in the kind of complex instrument at issue here" .**

**Plaintiff here will follow the Second Circuit's advice throughout this statement and the  reply to the Defendant's problematic Motion to Dismiss.**

9.  The **first option** from the indenture Section 10.01 allowed for TCV/Hoag to convert anytime after the purchase on November 28, 2011. Convert means exchanging the ownership of the $200,000,000 notes to ownership of 2,331,060 shares of stock (i.e. a conversion price of $85.79). The stock was trading near $70 at the time of the $200,000,000 note purchase. TCV/Hoag had the right to convert immediately with no restrictions on the timing. TCV/Hoag's option to convert was considered a "call equivalent position" and made the convertible note a derivative to the extent that TCV/Hoag's note was a "call equivalent position" and was operative.

10. Upon exercise of TCV/Hoag Option to Convert, the Option to Convert held by Netflix would be cancelled. If the note was converted under this scenario, the

5

acquisition of the stock by TCV/Hoag would not be a "purchase" for 16b purposes.Of course TCV/Hoag did not exercise their Option to Convert and it was eventually cancelled  This was somewhat similar to what happens when exchange traded calls expire .

11. The **second option** from section 10.05 of the indenture allowed the issuer, Netflix, the option to convert with the conversion price the same as TCV/Hoag. And TCV/Hoag had the liability to acquire the 2,331,060 shares upon the exercise of the issuer Netflix's Option to Convert.

12.  However there were substantial restrictions on when if ever, Netflix could convert. Under no circumstance could Netflix convert before 6 months had passed from Nov 28, 2011. If the 6 months had passed, Netflix would not be able to convert unless the stock advanced from $70 (i.e. where it was on November 28, 2011) to higher than $111.54 and stayed above $111.54 for at least 50 out of any 65 days. If those requirements were met, then Netflix had the right to convert anytime before the notes matured.

13. It is 100% certain that the **second option** was not a derivative when the notes were purchased on November 28, 2011. Netflix's option to convert was not a "put equivalent position" on Nov 28, 2011 since the value would not increase if the stock decreased after the purchase of the notes on Nov 28, 2011. The value of Netflix's Option to convert would not increase if the underlying stock increased in value.

**6**

So the Option to Convert held by Netflix was not a "put equivalent position" or a "call equivalent position" as of Nov 28, 2011. Thus the Option to Convert held by Netflix was not a derivative on November 28, 2011.

14. TCV/Hoag did **not** exercise its option to convert the "call equivalent position" which made the note a derivative on Nov. 28, 2011. Netflix exercised its Option to Convert on April 23, 2013 with the stock near $216.00. Netflix's Option to Convert was out-of-the-money and TCV/Hoag acquired the 2,331,060 shares at $85.7979 each share. The Netflix option to convert became a "put equivalent position" on approximately March 15, 2013. This "put equivalent position" owned by Netflix,required TCV/Hoag to acquire the shares upon exercise of Netflix's "put equivalent position".

15. TCV/Hoag's position was a "short put position" ( "call equivalent position") established by TCV/Hoag on March 15, 2013. The "short put position" of TCV/Hoag became a new a derivative on March 15, 2013 and can be considered another non exempt "purchase" that was matchable with sales within 6 months. Prior to the Netflix option becoming a put equivalent position for Netflix, effectively the note was a derivative only to the extent that the Option to Convert held by TCV/Hoag was a "call equivalent position". As it turned out TCV/Hoag never exercised its option to convert but Netflix did exercise its option to convert.

7

16. However, if TCV/Hoag decided to convert, that would automatically cancel Netflix's Option to Convert.  But Netflix's exercise of its Option to Convert automatically cancelled TCV/Hoag's Option to convert.

17. Attorneys for the defendant through-out their 12 b-6 Motion, refer to a **Mandatory Conversion** by Netflix, which is allegedly defined in Section 10.05 of the indenture, quoted above. However, **Mandatory Conversion** is not defined in 10.05, although the phrase is used in 10.05. At no time was it **Mandatory** that Netflix exercise their Option to Convert the notes or that TCV/Hoag do a **Mandatory Conversion**.

18. Netflix did not force TCV/Hoag to exercise its Option to Convert. Netflix exercised its Option to Convert. To summarize, TCV/Hoag acquired 2,331,060 shares from Netflix, when Netflix exercised its Option to Convert.

19. Attorneys for the defendants on page 10 on line 14- 26 make a ridiculous statement. They say

*"As a result, Plaintiff fails to allege any purchase within less than six months of TCV's alleged sales of Netflix stock in 2013. Plaintiff's allegation to the contrary—that "the TCV Defendants became purchasers of [the underlying] shares of Netflix common stock" on April 23, 2013, when "Netflix exercised its right to convert the Convertible Notes" (see Am. Compl. ¶¶ 21-24)—is a bare "legal conclusion couched as a factual*

**8**

1

2 *allegation" and thus "not entitled to the assumption of truth" on a motion to*
3 *dismiss. See Iqbal, 556 U.S. at 678-79. The Amended Complaint contains no*
4 *other well-pleaded allegation of a matchable purchase and no support for the*
5 *conclusion that "the TCV Defendants earned profit of approximately*
6 *$85,000,000" as a result of "purchases and sales that occurred within six*
7 *months of each other." (See Am. Compl. ¶ 26.) Because the Amended*
8 *Complaint lacks "sufficient factual matter" to permit a reasonable inference that*
9 *the TCV Parties are liable under Section 16(b),"*

10

11 20. It is a 100% certainty that the acquisition of the 2,331,060 shares by
12 TCV/Hoag on April 23, 2013 was due to Netflix's exercise of its Option to
13 Convert. And it is a 100% certainty that the acquisition of the shares is a
14 purchase of the stock for 16 b purposes at $85.7979 per shares pursuant to SEC
15 Rule 16 b-6 a) and b). The SEC Form 4 of April 23, 2013 confirm the voluntary
16 exercise of Netflix's Option to Convert. Netflix's Form 10 Q of April 26, 2013
17 also says "The Company elected to cause the conversion of all outstanding
18 Converti Notes with an aggregate principal amount of $200,000,000".

19

20 21.It is is an absolute certainty that TCV/Hoag made a non exempt sale of
21 450,000 shares to the market for an average price of $215 on April 25, 2013. If
22 we multiply 450,000 by ($215- $85.8), it equals $58,140,000. There was also a
23 non exempt sale to the market of 344,317 shares at approximately $163.5 on
24 1/31/2013. The profit was 344,317 x ($163.5-$85.8) equals $27,090,749. The
25 two profits add up to over $85,000,000.

26

27

28                                                                 9

1

2

3  22. Defendants' attorney can produce no words, phrases, sentences or

4  paragraphs from Rule 16 b-6 a) or b) that makes the acquisition of the

5  2,331,060 shares by TCV/Hoag an exempt purchase or exempt transaction from

6  Section 16 b. To claim so, shows he either does not understand the Rule or he is

7  deliberately deceiving the court. Plaintiff does not have to prove facts that are

8  obvious on their face and admitted by Defendants' SEC required filings.

9

10  **SEC Rule 16 b-6 a) and 6 b)**

11  23. Was the acquisition a "purchase" that was exempted from 16 b as

12  Defendants allege? We look to SEC Rule 16 b - 6 a) and b) for guidance.

13  Below is SEC Rule 16 b-6 a) and b) underlined.

14

15  § 240.16b-6 Derivative securities.

16  **(a)** The establishment of or increase in a call equivalent position or liquidation of

17  or decrease in a put equivalent position shall be deemed a purchase of the

18  underlying security for purposes of section 16(b) of the Act, and the

19

20  establishment of or increase in a put equivalent position or liquidation of or

21  decrease in a call equivalent position shall be deemed a sale of the underlying

22  securities for purposes of section 16(b) of the Act: Provided, however, That if

23  the increase or decrease occurs as a result of the fixing of the exercise price of a

24  right initially issued without a fixed price, where the date the price is fixed is not

25  known in advance and is outside the control of the recipient, the increase or

26  decrease shall be exempt from section 16(b) of the Act with respect to any

27  offsetting transaction within the six months prior to the date the price is fixed.

**10**

28

**(b)** The closing of a derivative security position as a result of its exercise or conversion shall be exempt from the operation of section 16(b) of the Act, and the acquisition of underlying securities at a fixed exercise price due to the exercise or conversion of a call equivalent position or the disposition of underlying securities at a fixed exercise price due to the exercise of a put equivalent position shall be exempt from the operation of section 16(b) of the Act: **Provided, however, That the acquisition of underlying securities from the exercise of an out-of-the-money option, warrant, or right shall not be exempt** unless the exercise is necessary to comport with the sequential exercise provisions of the Internal Revenue Code (26 U.S.C. 422A).

_____

24. Part a) refers to the establishment or increase of call and put equivalent positions and states that an increase in or an establishment of a "call equivalent position" at a fixed price is deemed a "purchase" for 16 b purposes. On March

15, 2013 a put equivalent position was established which was owned by Netflix since now Netflix's right to convert would increase in value as the stock dropped. TCV/Hoag then became short a "put equivalent position" also on March 15, 2013, thereby increasing TCV/Hoag's "call equivalent position", which constituted a "purchase" for 16 b purposes. All of these events were part of the contract voluntarily enter into by TCV/Hoag.

25. Part b) among other things, refers to underlying shares acquired **due to the exercise or conversion of a "call equivalent position"** and stating that such an acquisition "shall be exempt" from 16 b.

**11**

26. The 2,331,060 shares were **not acquired** by TCV/Hoag as a result of the exercise or conversion of a "call equivalent position" but were acquired as a result of an exercise of Netflix's "put equivalent position". Therefore the acquisition was not exempt from 16 b by Rule 16 b-6 b).

27. Part b) also says that " **Provided, however, That the acquisition of underlying securities from the exercise of an out-of-the-money option, warrant, or right shall not be exempt** .

28. The above in bold refers to an acquisition from the exercise of an out-of-the-money option. The Netflix Option was out-of-the money when exercised. Netflix exercised its right to sell 2,331,060 shares to TCV/Hoag at an exercise price of $85.80, when the stock was trading at $216. This fits perfectly the definition of an exercise of an out-of-the-money option. Therefore the acquisition of the 2,331,060 shares are not exempt from 16 b for a second reason and is considered a "purchase" for 16 b purposes. So there are two reasons why Rule 16 -b-6 b) does not exempt the acquisition of the 2,331,060 from 16 b as a matchable purchase.

29. Plaintiff has shown that there were two non exempt purchases established, other than the original note purchase.

**12**

Those were:

a) the establishment of the "call equivalent position" on March 15, 2013 by TCV/Hoag and

b) TCV/Hoag's acquisition of the underlying shares on April 23, 2013 from Netflix exercise of its "put equivalent position".

This can not be disputed.

30. These two purchases were matched to the 344,317 share sale on Jan 31, 2013 and the sale of 450,000 shares on April 25, 2013.

## Defendants allege that Rule 16 b-3(d)(3) exempts the purchase on 4/23/2013 from 16 b.

31. The defendants claim that "Rule 16 b-3(d) provides that "any transaction involving an acquisition from the issuer.... shall be exempt if... The issuer securities so acquired are held by the ( ) director for a period of six months following the date of such acquisition".

32. Apparently, the defendants have made an argument why the Nov 28, 2011 purchase of the convertible bonds may have been exempt from 16 b under Rule 16 b-3(d)(3).  But they have forgotten that it is the April 23, 2013 acquisition of the 2,331,060 shares from Netflix that they are trying to demonstrate to be exempt using Rule 16 b-3(d)(3). The acquisition of the 2,331,060 shares was followed by a sale within 2 days on April 25, 2013. So Rule 16 b-3(d)(3) does not apply. It is certain that it does not apply to the 450,000 shares sold at $216 on April 25, 2013.

**13**

### Alleged Unorthodox Transaction Exception

33. The defendants also make the invalid claim that the "mandatory conversion" (i.e. the undefined conversion) of the convertible notes falls under the "unorthodox transaction exception" to section 16 b liability. They base their theory on the idea that the conversion was outside of TCV/Hoag's control, which is a false theory.

34. The original purchase of the note and the rights and obligations of TCV/Hoag were voluntarily agreed upon by TCV/Hoag on Nov. 28, 2011. One of those agreed upon obligations was that if the Netflix stock was trading above $111.54 for 50 days, after May 28, 2012, TCV/Hoag would be short a put (i.e. hold a call equivalent position). But that short put position could be cancelled anytime TCV/Hoag wished to exercise its Option to Convert.

35. At anytime from Nov 28, 2011 until April 23, 2013, TCV/Hoag could have exercised its Option to Convert the loan into stock and cancelled Netflix Option to Convert. For whatever reason, Hoag decided it was in their best interests to allow Netflix to exercise its Option to Convert. Perhaps Hoag, as a long term Director influenced the Netflix decision to exercise its right to convert when they did, which was the day when the stock opened $45 higher than the previous day's market closing price. In all probability Hoag was aware of the pending good news that made the stock rise on April 23, 2013 and held off on its exercise until Netflix exercised. TCV/Hoag made a sale of 450,000 shares two days after the Netflix exercise and the rise of the stock after the highly positive

**14**

earnings announcement. It was impossible for TCV/Hoah to sell 450,000 shares on April 25, 2013 unless Netflix exercised their Option to Convert on April 23, 2013.

36. Defendants' attorney refer to the Kern County Land Co v. Occidental Petroleum Corp 411 U.S. 582 (1973).

Below is a quote from the Supreme Court from Kern.

"The possibility that Occidental had, or had the opportunity to have, any confidential information about Old Kern before or after May 11, 1967, seems extremely remote."

37. This is why the Supreme Court Ruled that the "sales" should not be considered subject to 16 b. The situation is far different with Hoag who was a long term Director and probably influenced the timing of the exercising of the Option to convert by Netflix to his benefit.

The Supreme court said:

" for we think it totally unrealistic to assume or infer from the facts before us that Occidental either had or was likely to have access to inside information, by reason of its ownership of more than 10% of the outstanding shares of Old Kern, so as to afford it an opportunity to reap speculative, short-swing profits from its disposition within six months of its tender-offer purchases."

But the situation was far different with the TCV/Hoag situation.

15

38. On page 15 of the Motion to dismiss, Defendants allege that the

**"Plaintiff Fails to Plausibly Allege that the TCV Funds were Statutory Insiders Subject to 16 b."**

39. Under that heading, the defendants state:

"The Amended Complaint lacks any allegation suggesting that any TCV Fund was an officer, director or 10% owner of Netflix at the time of the challenged transactions. As a result, Plaintiff fails to state a claim against the TCV Funds under Section 16(b). See Goldman, 740 F.3d at 874."

40. The SEC Form 4 filings themselves, which Hoag and TCV Funds filed on various days shows Hoag as Director of Netflix and a General Partner to the TCV Funds and the TCV Funds as beneficial and pecuniary owners of the shares traded and the transactions executed. The issuance of the $200,000,000 notes to the TCV Funds was considered by Netflix as a transaction related to both Hoag and the TCV Funds.

41. There is no need to repeat the obvious fact what is repeated in the several SEC Form 4 filings and the numerous Explanations of Responses on the SEC Form 4 filings. There is not sufficient information on those filings to indicate with certainty that the TCV Funds are deputized directors or that Netflix's board was aware of the status of the TCV Funds as possibly directors by deputization. There was however information on the SEC Form 4 filings that the TCV/Hoag group was acting as a group which made TCV subject to 16 b.

**16**

42. In Blau v. Lehman 368 U.S. 403 (1962) the U.S. Supreme Court held that Section 16 (b) encompasses shareholders who have the power to control who is appointed to the board, known as "directors by deputization".

43. In the Dreiling v. American Express case the Ninth Circuit court said that: "Whether the TRS executive was a director by deputization and whether the InfoSpace board was knowledgeable as to that relationship are questions of fact that defeat dismissal under Federal Rule of Civil Procedure 12(b)(6). We thus reverse and remand for further proceedings."

44. So whether the TCV Funds are directors or not and whether the Board of Netflix knew of their status can not be determined on a FRCP 12 b-6 Motion. This following is a statement by the Ninth Circuit in Dreiling v. American Express.

"Whether a company is a director by deputization is "a question of fact to be settled case by case and not a conclusion of law." Feder v. Martin Marietta Corp., 406 F.2d 260, 263 (2d Cir.1969); accord Blau, 368 U.S. at 408-09, 82 S.Ct. 451."

45. The Drieling Court also said:
A company may be a director by deputization without intending to be and without acknowledging that a deputy represents its interests on the issuer's board. See Feder, 406 F.2d at 265 ("[A] person . could act as a deputy . even in the absence of factors indicating an intention or belief on the part of both

**17**

companies that he was so acting.").   In light of these cases, the SEC has recognized the doctrine of directors by deputization but has left it to courts to decide how to apply § 16(b), and rules promulgated under it, to such directors. See Ownership Reports and Trading By Officers, Directors and Principal Securities Holders, SEC Release No. 34-26333, 53 Fed.Reg. 49,997 (proposed Dec. 2, 1988) (recognizing doctrine of directors by deputization but noting that the SEC "does not propose to codify case law relating to deputization.").

46. And the Dreiling Court said:

"Whether TRS was a director by deputization, and, if so, whether InfoSpace, in approving the general Prio-InfoSpace transaction, intended to approve a specific insider-issuer transaction with respect to TRS, are among the issues to be resolved on remand".

47. So, Plaintiff has not made a specific claim that the TCV Funds were deputized directors and whether netflix was aware of their status, choosing to wait for discovery after a decision on a 12 b 6 Motion to Dismiss. Thus the defendant's claim that the suit lacks the suggestion of deputized directors is meaningless as the Form 4 filings suggest it numerous times and it is not to be be determined on a 12 b-6 Motion to Dismiss.

------------------------------------------

**18**

## Statement of 22 Certain Facts and Law.

48. Given that the Netflix Convertible is a bit more complex than regular convertible notes, the Plaintiff wishes to assist the court in understanding the Convertible note in every relevant detail. So the Plaintiff will present an explanation of the note and the relevant events that surround that transaction:

49. So that the court will be able to more easily understand the circumstances that surround this case, Plaintiff will state a number of most relevant undisputed facts and events that have taken place:

Those are :

**1.** On July 28, 2011 a sale of 4510 shares of Netflix stock was made by TCV/Hoag to the market and reported on SEC Form 4  as linked below: This sale was an admitted non- exempt sale matched to a later apparent non-exempt purchase by TCV/Hoag of $200,000,000 million of convertible notes.

This is a filing of a SEC Form 4 linked below.

http://www.secform4.com/filings/1065280/0001082906-11-000024.htm...

This filing was made by Netflix Director, Jay C. Hoag saying the form was filed by one reporting person. Apparently Hoag had been granted non qualified stock options which he exercised and sold the shares to the market.  But in the Explanation of Responses, there is the following language:

*( 1 )Jay C. Hoag ("Hoag") has the sole voting and dispositive power over these shares; however, TCMI, Inc. has a right to 100% of the pecuniary interest in such shares. Hoag is a stockholder and director of TCMI, Inc. Hoag disclaims*

*19*

beneficial ownership of such shares except to the extent of his pecuniary interest therein. This does not include shares held by The Hoag Family Trust U/A DTD 08/02/1994 and Hamilton Investments Limited Partnership, which are separately reported on this Form 4.

The explanation indicates that both Hoag and TCMI have a pecuniary interest and beneficial interest in such shares.

Below is a graph of the stock movement 30 days before and 30 days after the sale of the 4510 shares.



NFLX Stock closed at $266.62 on July 28, 2011, prior to a 7:1 stock split in 2015. The graph shows the prices after the split.

**2.** a) The July 28, 2011 sale to the market was followed 4 months later by the voluntary purchase of non interest payable convertible notes from the issuer, Netflix to TCV/Hoag on November 28, 2011. The amount paid for the notes was $200,000,000.

b) TCV/Hoag voluntarily assumed its obligations in the indenture, including the obligation to acquire 2,331,060 shares of stock upon Netflix's exercise of its Option to Convert.

**20**

This is a filing of a Form 4 linked below showing the note purchase.

http://www.secform4.com/filings/1065280/0001123292-11-000892.htm.

c) The Explanation of Responses in the SEC Form 4 filings relating to the recovery of short term profits by Netflix from TCV/Hoag is below:

*( 1 )The Reporting Person's pecuniary interest in a sale of 4,510 shares of common stock on July 28, 2011 was greater than his pecuniary interest in the deemed purchase on November 28, 2011 of an equivalent number of shares underlying the acquisition of the convertible notes described in this report. As a result, the Reporting Person realized short-swing profits that were subject to disgorgement under Section 16(b) of the Securities Exchange Act of 1934. The Reporting Person has paid to the Issuer the entire amount of the profits.*

d) This recovery of these "short swing profits" is mentioned in the Defendants' 12 b-6 Motion to Dismiss and has been confirmed as valid on page 9 and 10 of Defendant's Motion to Dismiss. This recovery of short term profits, mentioned above, is possible only if SEC Rule 16 b-3(d) did not apply to make the purchase of the $200,000,000 note exempt from 16 b. If 16 b-3(d) did apply to the purchase of the note, there would have been no recovery of profits.

e) It is therefore correct to assume that the later non exempt sales of stock by TCV/Hoag such as on Jan 31, 2013 and April 25, 2013 were matchable to the non exempt acquisitions of stock from the exercise of out-of-the-money put equivalent positions by Netflix on April 23, 2013 and that Rule 16 b-3 would not apply as it did not apply on Nov 28, 2011.

f) This recovery of the short term profits mentioned in the Explanation of Responses necessarily required that the purchase of the notes on November

21

28, 2011 was not exempt from 16 b via 16 b-3. This non applicability of 16 b-3

to the purchase of the notes necessarily requires that the acquisition (i.e. the

purchase) of the 2,331,060 shares by TCV/Hoag was not exempt under SEC

Rule 16 b-3.

g) The filing of SEC Form 4 is Required to be made by officers, directors, by

groups controlled by directors and more than 10% owners. Jay C. Hoag

admittedly was a director who controlled a group of Funds and other parties

who bought the $200,000,000 convertible note. The question of whether the

TCV Funds were directors by deputization is a question of fact and is not to be

addressed on a 12 b-6 motion to dismiss. See Dreiling v. American Express.

h) See the Explanation of Responses filed with the Form 4 on November 28,

2011 below.

*(3 )The Notes are directly held by TCV VII, L.P., TCV VII(A), L.P. and TCV Member Fund L.P. ("Member Fund"). Jay Hoag and nine other individuals (the "Class A Directors") are Class A Directors of Technology Crossover Management VII, Ltd. ("Management VII") and limited partners of Technology Crossover Management VII, L.P. ("TCM VII") and Member Fund. Management VII is the general partner of TCM VII, which is the general partner of TCV VII, L.P. and TCV VII(A), L.P. Management VII is also a general partner of Member Fund. The Class A Directors, Management VII and TCM VII may be deemed to beneficially own the securities held by TCV VII, L.P., TCV VII(A), L.P. and Member Fund, but each of the Class A Directors, Management VII and TCM VII disclaim beneficial ownership of such securities except to the extent of their pecuniary interest therein. Management VII has no pecuniary interest in any of the securities that are being jointly reported by the Reporting Persons on this Form 4.*

**22**

i) Below is a graph of the stock movement 30 days before and 30 days after the purchase of the $200,000,000 note by TVC Hoag.



NFLX Stock closed on November 28, 2011 at $69.95, prior to the 7:1 split in 2015. The graph shows the prices after the split. When the 4510 shares were sold, the stock closed at $266.62. So the stock dropped $196 points from its closing price on July 28, 2011 when the 4510 shares were sold and then TCV/Hoag bought the Convertible note after the stock dropped $196 points.

j) These convertible notes had 2 options embedded in the contract indenture.

k) The attorneys for TCV/Hoag are attempting to combine the two Conversion options in their analysis which according the Second Circuit in Magma Power v. Dow Chemical is Problematic.

the Second Circuit said that :

**"The better approach is to treat as analytically distinct each option contained in the kind of complex instrument at issue here"** .

However, if TCV/Hoag decided to convert, that would automatically cancel Netflix's Option to convert. If Netflix converted, that that would automatically cancel TCV/Hoag's Option to convert.

23

Attorneys for the defendant through-out their 12 b-6 Motion, refer to a **Mandatory Conversion** by Netflix, which is allegedly defined in Section 10.05 of the indenture, quoted above. However, **Mandatory Conversion** is not defined in 10.05, although the phrase is used in 10.05. At no time was it **Mandatory** that Netflix exercise their Option to Convert the notes or that TCV/Hoag do a **Mandatory** Conversion.

Netflix did not force TCV/Hoag to exercise its Option to Convert. Netflix exercised its Option to Convert.

**3.** On January 31, 2013, TCV/ Hoag voluntarily sold 344,317 shares in the market with the stock trading at about $163.5.The shares were owned prior to the sales and had been purchased 7 months earlier for prices in the low $70s.

See the Form 4 filing linked  below:

http://www.secform4.com/filings/1065280/0001082906-13-000003.htm

 Below is a graph of the stock movement 30 days before and 30 days after the sale of the 344,317 shares owned by TCV/Hoag prior to Netflix's conversion. The Netflix Option to convert was not a derivative at the time. It shows that the stock on Jan 24, 2013 was for the first time trading at greater than 130% x $85.79 and

continued there for the next 37 days. it stayed above that value for at least another 14 days, when Netflix then had the Option to Convert the notes.

1

2



3

4

5

6

7

8    TCV/Hoag voluntarily sold 344,317 shares to the market on Jan 31, 2013 when

9    the stock increased to $163.00 and closed at $166 prior to the 7:1 split.

10   Netflix's Stock was trading at $97.00, 10 days earlier.

11

12   **4**. Below is a link to a SEC Form 4 of April 23, 2013  showing a Conversion by

13   Netflix causing an acquisition by TCV/Hoag of 2,331,060 shares  using  the

14   $200,000,000 note as payment of the exercise price. This conversion took place

15   after a jump in the stock of $43.00 on April 23, 2013. Column 4 of the Non

16   Derivative Filings on the SEC Form 4 shows an "A" meaning  that TCV/Hoag

17   acquired 2,331,060 shares of Netflix on Apr 23, 2013 from Netflix's exercising of

18   Netflix's option to convert.

19   http://www.secform4.com/filings/1065280/0001082906-13-000010.htm

20

21   It is a 100% certainty that the option to convert that was exercised by Netflix on

22   April 23, 2013 was an out-of -the-money option. SEC Rule 16 b-6 (b) says in the

23   sentence quoted below:

24   Thus the acquisition of the 2,331,060 shares by TCV/Hoag was **not exempt**

25   **from 16 b and was a non-exempt purchase matched with two**

26   **non-exempt sales of Netflix by TCV/Hoag.**

27                                    **25**

28

1

2   At any time after the purchase of the $200,000,000 of convertible notes by
3   TCV/Hoag, TCV/Hoag could have converted the notes. TCV/Hoag believed it was
4   to their benefit not to convert the notes at any time between Nov. 28, 2011 and
5   April 23, 2013. They voluntarily chose not to convert, thereby allowing Netflix's
6   predictable conversion. The stock was trading at about $215 on April 23, 2013
7   and the exercise price (i.e. conversion price) of Netflix's Option to convert was
8   $85.7979. Thus the Option to convert was  $129.00 out-of-the-money when
9   exercised and caused the non exempt purchase of the stock by TCV/Hoag.

10

11   Below is a graph of the stock movement 30 days before and 30 days after the
12   exercise of the option to convert the notes by Netflix. This exercise of Netflix's
13   option to convert, cancelled TCV/Hoag's right to convert.

14
15
16   
17
18
19

20   Stock closed  on April 23, 2013 at $215 up $45.00 from the previous day's close
21   prior to the 7:1 stock split in 2015.
22

23   **5**. Below is a Link to the SEC Form 4 April 25, 2013 showing the voluntary sale
24   in the market  by TCV/Hoag of 450,000 shares all or most of which he and his
25   partners received from Netflix's exercising its right to convert.
26   http://www.secform4.com/filings/1065280/0001082906-13-000011.htm
27
28                                           **26**

This is a filing of a Form 4.

The graph below shows the movement of the stock around the day of the voluntary 450,000 share sale. The stock increased $43 on April 23, 2013.



Stock on April 25, 2013 closes at $213 prior to the 7:1 stock split of 2015. The graph shows the effective stock prices 30 days before and 30 days after the non exempt sale.

In summary of the above 5 graphs, we find that the graphs show 3 sales (Graphs 1, 3, and 5). The 3 graph and the 5 graph show sales were at prices much above what the stock were trading for just days earlier these were the sales on Jan 31, 2013  and the April 25, 2013 sale.

The original large purchase of the $200,000,000 convertible note with embedded calls to buy 2,331,060 was made when the stock had dropped $196 below the sales price of the matched stock 4 months earlier.

And the exercise of Netflix's Option to Convert was done when the stock had just jumped, which Hoag had anticipated and in all probability influenced.

———————————————————————

**6.** It is a 100% certainty that Plaintiff owned stock in Netflix prior to the initial filing of this suit for recovery on behalf of Netflix under 16b. That stock is still owned by Plaintiff as of the day of this writing.

**7.** It is also a 100% certainty that Netflix was requested to seek recovery of the profits made from the non-exempt sales and non-exempt purchases within 6 months by TCV/Hoag. That request was made in December of 2014.

**8.** It is 100% certain that the Options to Convert that TCV/Hoag owned, were never exercised and were cancelled. The options that were exercised were Options to Convert owned by and were exercised by Netflix on April 23, 2013 . These were out-of-the-money on April 23, 2013.

**9.** It is 100% certain that the acquisition of the 2,331,060 shares on April 23, 2013 by TCV/Hoag were as a result of the exercise by Netflix of Netflix's Option to Convert and was not due to the exercise or conversion of a "call equivalent position".

**10.** Plaintiff **does not** allege that the exercise of Netflix's Option to Convert was a purchase.

**11**. Plaintiff **does allege** that it is 100% certain that the acquisition of the stock by TCV/Hoag as a result of Netflix's exercise of its Option to Convert is a separate new non-exempt purchase matchable against non-exempt sales of stock within 6 months for 16 b purposes.

**28**

**12.** It is 100% certain that the acquisition by TCV/Hoag of 2,331,060 shares on April 23, 2013 as a result of Netflix exercising its Option to Convert was a non-exempt purchase. The purchase is matched with a non-exempt sale of 450,000 shares to the market on April 25, 2013 and also matched with the non-exempt sale or 344,317 shares on Jan 31, 2013.

**13.** It is a 100% certainty that TCV/Hoag could have but chose not to exercise its Option to Convert prior to the April 23, 2013 exercise by Netflix.

**14.** It is a 100% certainty that TCV/Hoag had the voluntary choice to exercise its right to Convert anytime after the purchase of the $200,000,000 note on Nov 28, 2011.

**15.** It is a certainty that had TCV/Hoag exercised its right to convert, the acquisition of the 2,331,060 shares may not be considered a non-exempt purchase for 16 b.

**16.** It is a certainty that TCV/Hoag was a long term director of Netflix, having been a director since 1999. This made Hoag aware of inside information about future earnings announcements, especially the announcement after the close of trading on April 22, 2013. He was also probably aware of and influenced future decisions of company officials about when to exercise Netflix's Option to Convert the $200,000,000 note. Netflix exercised its Option to convert one day after that the very favorable earning announcement was made on April 22 after the close of trading. It is highly likely that Hoag had knowledge of the earnings

announcement prior to its being made public and was aware of Netflix plan to exercise its Option to Convert on April 23, 2013. This knowledge influenced his decision to hold off from exercising the Notes.

**17.** It is a certainty that Netflix's Option to Convert was not a "put equivalent position" on and immediately after the purchase of the note by TCV/Hoag on Nov 28, 2011.

**18.** It is a certainty that Netflix's Option to Convert became a "put equivalent position" on or around March 15, 2013, when Netflix's Option to Convert became operational. This event was considered the establishment of a "put equivalent position" by Netflix. It was also an increase of a "call equivalent position" by TCV/Hoag and was a non-exempt purchase by TCV/Hoag for 16 b purposes. The establishment of or an increase of a "call equivalent position" is considered a purchase pursuant to Rule 16 b-6(a) and was matched against the non exempt sales on Jan 31, 2013 and on April 25, 2013 by TCV/Hoag.

**19.** It is therefore clear that there were non-exempt purchases on March 15, 2013 and on April 23, 2013 and both were within 6 months of non exempt sales on Jan 31, 2013 and on April 25, 2013.

30

**20** It is a 100% certainty that TCV VII, L.P., TCV VII(A), L.P., and TCV Member Fund, L.P. reported on SEC Form 4s in the #7 Column in Table I **The Nature of Indirect Beneficial Ownership (Instr.4)** in

a Filing dated 11/28/2011 (i.e. the purchase of the $200,000,000 note) also on

a Filing dated     5/8/2012 ( i.e. the purchase of 200,000 shares) also on

a Filing  dated     5/10/2012 ( i.e. the purchase of 143,400 shares) also on

a Filing dated     1/31/2013 (i.e.the sale of 344,317 shares), also on

a Filing  dated     4/23/2013 (i.e. the acquisition of 2,331,060 shares), also on

a Filing  dated     4/25/2013  (i.e. the sale of 450,000 shares)

These filings make it perfectly clear that the three TCV Funds are subject to Section 16 b of the 1934 Act. on the dates of the transactions. See  Form 4 Instruction 4. See also Rule 16 a- 3(g).

These filings contradict the statements that attorneys make on pages 15 and 16 of their Motion to Dismiss, where they are claiming that the TCV Funds are not subject to Section 16 b.

Surely these 6 filings mentioned above are stating that the 3 TCV Funds are subject to 16 b and plaintiffs accept that as true.

**21.** It is also 100% certain that the TCV Funds are subject to 16 b, given that they paid the recovery to Netflix from the Hoag matched sale of 4510 on July 28, 2011 as Hoag could have been exempt from that violation by SEC Rule 16 b-3(d)(3).

**22**. In summary, this case involves three transactions that are acquisitions of the underlying stock that are considered non exempt purchases for 16 b purposes.                                        **31**

Those three are.

A) The purchase of the $200,000,000 note with the embedded calls on Nov 28,2011 giving the holder of the notes the right to acquire the stock at a fixed price. This purchase could not be matched with sales of stock after May 28,2012 for 16 b purposes.

B) When Netflix became owner on March 15, 2013 of the "put equivalent position", TCV/Hoag was liable to have to purchase stock from Netflix if Netflix exercised its Option to Convert. TCV/Hoag's liability was considered a short put position (i.e. a call equivalent position) on and after March 15, 2013. Prior to March 15, 2013, Netflix did not have the right to convert. Netflix therefore had no "put equivalent position" prior to March 15, 2013 and TCV/Hoag had no liability under it prior to March 15, 2013.

C) The exercise of the out-of-the-money "put equivalent position" was made by Netflix. That exercise caused the acquisition of Netflix stock by TCV/Hoag of the 2,331,060 shares

———————————————————————

Respectfully submitted:

Darrell Jordan

**32**